## AMERICAN FEDERATION OF STATE, COUNTY AND MUNICIPAL EMPLOYEES v DEPARTMENT OF MENTAL HEALTH

Docket No. 100552. Argued December 6, 1995 (Calendar No. 9). Decided June 25, 1996. Rehearing denied 453 Mich 1204.

The American Federation of State, County and Municipal Employees, AFL-CIO, and Lola DeBois and Shirley Towns, employees of Michigan Community Service, Inc., a nonprofit corporation providing residential treatment for developmentally disabled adults, brought an action in the Ingham Circuit Court against the Department of Mental Health and the Civil Service Commission, seeking a declaration that proposed revisions of departmental guidelines and the department's standard form contract constitute rules under the Administrative Procedures Act, MCL 24.210 *et seq.*; MSA 3.560(101) *et seq.*, and thus are required to be promulgated pursuant to the act's specific rule-making procedures. The plaintiffs also sought to enjoin adoption of the revisions. The court, James R. Giddings, J., granted summary disposition for the defendants, finding that the revisions did not constitute rule making. The Court of Appeals, JANSEN, P.J., and R. L. ZIOLKOWSKI, J., (CONNOR, J., dissenting), reversed and remanded to the trial court for entry of summary disposition for the plaintiffs, finding that while the department's decision to contract with private providers is a permissive exercise of statutory authority, the revisions of the guidelines and the standard contract nevertheless constitute rules under the APA, requiring promulgation pursuant to APA procedures (Docket No. 140834). The defendant appeals.

In an opinion by Justice MALLETT, joined by Justices LEVIN, CAVANAGH, and BOYLE, the Supreme Court *held:*

The Department of Mental Health's proposed revised guidelines and standard form contract prescribing departmental policies for the provision of care to group home residents constitute rule making under the APA. Consequently, the department was required to follow the procedural requirements designed to afford the interested parties notice and an opportunity to be heard before implementing them.

1. The department may not do indirectly what it could not do directly; namely, prescribe policies and standards affecting the care it is statutorily required to provide without complying with APA procedures. The guidelines and standard form contract terms that gov-

ern the provision of care to group home residents constitute rules within the APA definitions because they set forth the department's standards and policy concerning the care administered in group homes, implementing the applicable requirements of the Mental Health Code. In reality, the standard form contract is an all or nothing proposition—if the plaintiff were to voluntarily choose not to contract, it would choose to go out of business.

2. While the department has discretion regarding whether to contract for the provision of statutorily mandated services, once it decides to do so, it cannot abdicate its responsibilities under the Mental Health Code and the APA and set the standards and policies that regulate the provision of such services without complying with the APA's procedural requirements. The terms of the standard form contract that govern the provision of care to group home residents that are developed and set by the department must be promulgated as a rule. Only those contract provisions that serve to implement an agency's statutory duties or mission can be deemed a rule under the APA definition. It is crucial that standard contracts that prescribe an agency's policies regarding the implementation or application of its statutory duties be subjected to the democratic process contemplated by the APA.

Vacated and remanded.

Justice WEAVER, joined by Chief Justice BRICKLEY and Justice RILEY, dissenting, stated that the guidelines and the standard contract utilized by the Department of Mental Health when contracting with group home providers for the purchase of specialized residential mental health services do not constitute rules or rule making, and thus are exempt from the formal adoption requirements of the Administrative Procedures Act.

The Mental Health Code authorizes the Department of Mental Health to contract for services for mentally handicapped residents by utilizing a standard form contract to obtain these services in provider homes. Once a provider agrees to enter into a contract with the department, the department's guidelines also apply. The guidelines have no legal force or effect, however, until a provider agrees to be bound to the terms of an individual contract with the department.

The revised guidelines, as interpretive rules, and the standard form contract, as an exercise of permissive authority, are excused from the APA's rule-making procedures because they do not affect the rights of the general public, but only the rights of the parties who voluntarily contract with the department. Furthermore, the standard contract itself is the means and manifestation of the department's exercise of permissive statutory authority. Because

the department's decision to contract with private providers is a permissive exercise of statutory power, and the guidelines do not affect the public under MCL 24.207(j); MSA 3.560(107)(j), the standard contract and the guidelines are not rules. Thus, the revisions of the guidelines and the standard contract do not constitute rule making, but fall under statutory exceptions to the APA definition of a rule.

In this case, the act of supplying guidelines to private mental health providers who choose to enter into a contractual arrangement with the department does not convert the guidelines into legislative rules. Rather, the guidelines are interpretive rules that inform providers of the standards the department expects and demands. The use of a standard form contract, and the revisions the department chose to make to that contract by virtue of the revised guidelines, is an exercise of permissive authority that is expressly excused from the APA's definition of a rule. The department's choice of with whom to contract is a permissive exercise of its statutory power. Should the plaintiffs seek such a contractual relationship, they are free within the parameters of bargaining to change or accept any of the terms of the proposed contract, and, upon acceptance and receipt of the contract, the terms of the guidelines.

206 Mich App 382; 522 NW2d 657 (1994) vacated.

*Webb & Hildebrandt, P.C.* (by *L. Rodger Webb*), for the plaintiffs.

*Frank J. Kelley*, Attorney General, *Thomas L. Casey*, Solicitor General, and *Gary P. Gordon* and *Richard P. Gartner*, Assistant Attorneys General, for the defendant.

MALLETT, J. In this case, we must determine whether the guidelines and standard contract utilized by the Department of Mental Health when contracting with group home providers for the purchase of specialized residential mental health services constitute administrative "rules" that must be promulgated pursuant to the Administrative Procedures Act, MCL 24.201 *et seq.*;  MSA 3.560(101) *et seq.*  We hold that to the extent that they set forth departmental policy and

standards concerning the care received by individuals in group homes, they constitute "rules" for purposes of the APA.

FACTS

Plaintiffs Lola DeBois and Shirley Towns are employees of Michigan Community Service, Inc., a nonprofit corporation providing residential treatment for developmentally disabled adults. Plaintiff American Federation of State, County, and Municipal Employees (AFSCME) is a voluntary, unincorporated association that represents public employees. Plaintiffs brought suit against the Department of Mental Health and the Civil Service Commission, arguing that proposed revisions of departmental guidelines and the standard form contract, which is incorporated by reference in the guidelines and is used whenever the department contracts with private residential mental health service providers, constitute "rules" under the APA.[1] Plaintiffs argued that as such, they must be promulgated pursuant to the specific rule-making procedures of the APA.[2]

Plaintiffs sought declaratory and injunctive relief against the department to enjoin the revisions of the guidelines. A preliminary injunction was granted by the trial court, and a motion filed by the department to vacate the injunction was denied. Plaintiffs then

---

[1] For example, one proposed change would require that only direct-care staff "who work independently with recipients" need to complete eighty credit hours of training. The previous version required all care staff, regardless of contact with patients, to acquire the eighty hours of training. Another proposed change would delete the need for "periodic evaluations of staff." Yet another would eliminate the requirement that all provider homes have "written personnel policies and procedures." Proposed Revised DMH-3008B.

[2] MCL 24.201 et seq.; MSA 3.560(101) et seq.

filed a motion for summary disposition regarding whether the revisions of the guidelines and standard contract constituted rule making. The trial court denied plaintiffs' motion, and instead, granted summary disposition for defendants pursuant to MCR 2.116(I)(2)[3] and MCR 2.116(C)(10).[4]

Plaintiffs appealed. The Court of Appeals reversed the trial court's grant of summary disposition in favor of defendants and remanded to the trial court for entry of summary disposition in favor of plaintiffs.[5]

I

The Mental Health Code entrusts to the Department of Mental Health the duty of providing "adequate and appropriate mental health services . . . to all citizens throughout the state." MCL 330.1116;     MSA 14.800(116).   In carrying out its statutory duty, the department has for many years provided care to individuals through various state institutions and programs. In the late 1970s, the department was involved in a lawsuit concerning the care of patients in state mental hospitals. A consent decree ended that lawsuit and provided that patients be cared for "in the least restrictive setting." *Residential Systems Co v Int'l Union, United Automobile, Aerospace & Agricultural Implement Workers of America,* unpublished decision of the NLRB, Region 7, issued April 8, 1988 (Case No.

---

[3]   If it appears to the court that the opposing party, rather than the moving party, is entitled to judgment, the court may render judgment in favor of the opposing party. [MCR 2.116(I)(2).]

[4]   Except as to the amount of damages, there is no genuine issue as to any material fact, and the moving party is entitled to judgment or partial judgment as a matter of law. [MCR 2.116(C)(10).]

[5]   206 Mich App 382; 522 NW2d 657 (1994).

7-EC-18329). This resulted in a mass movement of for-
mer patients of state institutions into group homes
that are owned and operated by private contractors.
The Mental Health Code permits the department to
carry out its duty to provide care to such patients by
contracting with private operators. MCL 330.1116(j);
MSA 14.800(116)(j).

The department has utilized a standard form con-
tract with hundreds of group home providers for the
provision of care to developmentally disabled persons
who in the past were cared for directly by the depart-
ment. In 1990, the department issued a notice, in the
form of a "proposed guideline revision," indicating
proposed changes to the standard form contract that
is incorporated by reference and attached to the
guidelines. The express purpose of the proposed
guidelines was to rescind and replace the standard
form contract.

While the guidelines purport to allow modification
of the standard contract terms upon "prior written
approval of the director,"[6] the record indicates that, in
reality, group home providers may only do business
with the department if they agree to the standard
form contract without modifications.[7] The following
excerpt from proceedings in the circuit court is
telling:

> *The Court*: The fact of the matter is, Mr. Gartner, and
> correct me if I'm wrong, isn't this an either/or situation?
> The Department says, if you want to do business with us,
> here are the conditions of this contract, and you either

---

[6] Guideline III-C-001-0004, part (V)(B), p 3.

[7] Guidelines do not allow department staff who are directly involved in
the contracting process to negotiate deviations from the standard terms.

agree with those conditions or we will not be doing business with you; isn't that a fact?

*Mr. Gartner*: That's not unusual; sure, that's true.

*The Court*: My question wasn't how unusual it was, my question was, is it true that the Department says here are the standards, either you comply with them or we have no contract; isn't that true?

*Mr. Gartner*: Sure, it's true.

In light of this background, we think it fairly obvious that the department may not do by contract what it could not do if it were providing these residential mental health services itself. If the department did not contract for these services, it would have to comply with the relevant APA procedures before making the types of substantive changes relating to the provision of care in group homes that it is attempting in the proposed guidelines and standard form contract. It defies reason to allow the department to do indirectly what it could not do directly; namely, prescribe policies and standards affecting the care it is statutorily required to provide without complying with APA procedures.

The contract involved here is not for the provision of light bulbs, laundry services, or the proverbial widget. Rather, many of the provisions in this standard form contract, and the changes to those provisions, go to the heart of the department's statutory mandate. The following sampling of the proposed changes to the contract are instructive: (1) The omission of language requiring group homes to comply with all Department of Mental Health guidelines and directives, (2) the omission of language prohibiting certain monies intended for direct-care worker training and wages from being used for administrative employee

bonuses, (3) the omission of language requiring homes to submit staff verification reports, (4) the addition of a new provision permitting up to five percent of certain monies for direct-care workers training and wages to be used for other purposes, (5) the omission of provisions requiring certain minimum preemployment inquiries of persons applying to work at a group home, (6) the omission of a provision that required continued in-service training of direct-care staff, (7) the omission of language requiring group homes to periodically evaluate their direct-care staff in order to assess and improve their job performance, and (8) the omission of a provision requiring staff who are involved in passing out medication to successfully complete an in-service training program. It is evident from this sampling that many of the contract's provisions set forth departmental policy and standards that have a direct effect on the care provided in group homes, care that the department is statutorily mandated to provide.

II

The guidelines and standard form contract constitute "rules" within the APA definition. Pursuant to the APA, a "rule" is: (1) "an agency regulation, statement, standard, policy, ruling, or instruction of general applicability," (2) "that implements or applies law enforced or administered by the agency, or that prescribes the organization, procedure, or practice of the agency . . . ." MCL 24.207; MSA 3.560(107).

Many provisions of the standard form contract set forth the department's standards and policy concerning the care administered in group homes in the state. As such, the guidelines and contract provisions imple-

ment and apply the Mental Health Code's requirement that the department provide mental health services appropriate to the public's needs and prescribe the department's procedure relevant to these services. Further, they have direct applicability to all those who reside and work in these homes. The "general applicability" requirement does not exclude from the definition of a rule those rules that are directed at particular persons rather than the public at large. See Bonfield, State Administrative Rule Making, § 3.3.2(b), pp 78-80.

The dissent concludes that the proposed guidelines and standard contract are merely "guidelines" or an "interpretive statement" and do not constitute "rules" because they do not affect the rights of the general public, but only the rights of those who voluntarily enter into a contractual relationship with the department. This conclusion is factually and legally in error.

The label an agency gives to a directive is not determinative of whether it is a rule or a guideline under the APA. *Detroit Base Coalition for the Human Rights of the Handicapped v Dep't of Social Services*, 431 Mich 172, 188; 428 NW2d 335 (1988). Instead, we must review the "actual action undertaken by the directive, to see whether the policy being implemented has the effect of being a rule." *Id.*, quoting *Schinzel v Dep't of Corrections*, 124 Mich App 217, 219; 333 NW2d 519 (1983). See also Bienenfeld, Michigan Administrative Law, p 4-5. Likewise, an agency may not circumvent APA procedural requirements by adopting a guideline in lieu of a rule.[8] MCL 24.226;

---

[8] The APA requires an agency to give notice of proposed rules or rule changes, to hold a public hearing, and to submit the proposed rule or rule changes to the Legislature's Joint Committee on Administrative Rules for

MSA 3.560(126). Further, in order to reflect the APA's preference for policy determinations pursuant to rules, the definition of "rule" is to be broadly construed, while the exceptions are to be narrowly construed. *Detroit Base Coalition, supra* at 183-184.

In contrast to a rule, the APA defines a "guideline" as "an agency statement or declaration of policy which the agency intends to follow, which does not have the force or effect of law, and which binds the agency but does not bind any other person." MCL 24.203(6); MSA 3.560(103)(6). The standard form contract is not a "guideline" because, contrary to the dissent's assertions, it does bind other persons, namely, the private group home operators who seek to provide residential mental health services under contract with the department. As noted earlier, the standard form contract is in reality an all or nothing proposition. Group home providers, many of whose sole purpose for organizing is to provide residential mental health services under contract with the department, simply do not have the bargaining power to negotiate deviations from the standard terms.

The contention that the standard contract is merely a guideline because it only binds providers if they voluntarily enter into a contract with the department is effectively refuted by the Court of Appeals holding in *Delta Co v Dep't of Natural Resources*, 118 Mich App 458; 325 NW2d 455 (1982). In *Delta Co*, the DNR argued that the trial court erred in finding that the APA was violated when the DNR conditioned issuance of a

review and approval. In contrast, proposed guidelines and guideline revisions do not require a public hearing, legislative review, or legislative approval. MCL 24.224-24.226 and 24.231 *et seq.*; MSA 3.560(124)-3.560(126) and 3.560(131) *et seq.*

license to operate a solid waste disposal area on "guidelines, drawings and policies, and engineering expertise." *Id.* at 467. The Court held:

> Here, the license was conditioned on compliance with 31 stipulations which were departmental guidelines and internal policies. Clearly, then, these guidelines were binding. Therefore, they effectively were rules under the guise of guidelines and policies. They did not fall within the exceptions to the rule. The "stipulations" did affect the rights and practices available to the public. The rights of the public may not be determined, nor licenses denied, on the basis of unpromulgated policies. [*Id.* at 468.]

As in the present case, the agency's directives in *Delta Co* could only be binding if the plaintiff voluntarily chose to seek licensure. However, it is clear from the Court of Appeals holding that this did not render the agency's directive to be any less binding. Similarly, the Department of Mental Health's standard form contract and guidelines are not "guidelines" merely because a plaintiff can choose not to contract with the department. That "choice" for the plaintiff here is even more ludicrous than for the plaintiff in *Delta Co*. While the county could seek another landfill, the group home provider's sole purpose of formation is often to provide services pursuant to contract with the Department of Mental Health. By "choosing" not to contract, the provider chooses to go out of business.

The dissent also argues that the guidelines and standard contract are not rules because they are an "exercise of permissive authority that is expressly excused from the APA's definition of rule." *Post* at 21. The dissent reasons that because the department may choose whether to enter into contracts for the provi-

sion of residential services, the standard form contract cannot be a rule. The error in this reasoning is that while the department has discretion regarding *whether* to contract for the provision of statutorily mandated services, once it chooses to do so, it cannot abdicate its responsibilities under the Mental Health Code and the APA and set the standards and policies that regulate the provision of such services without complying with the APA's procedural requirements.

The Court of Appeals decision in *Spear v Michigan Rehabilitation Services*, 202 Mich App 1; 507 NW2d 761 (1993), makes precisely this point. In *Spear*, the plaintiff contended that the agency reduced and terminated her benefits pursuant to an agency policy of eligibility based on need and means that should have been, but was not, adopted as a rule consistent with the requirements of the APA. The Court of Appeals agreed, reversing, in a unanimous decision, the circuit court's conclusion that because it was within the agency's discretionary powers whether to apply a "needs test" for determining eligibility, the policy need not be promulgated by a rule. The Court reasoned that while the initial determination whether to apply a needs test was discretionary, once the agency decided to employ such a test, the policies implementing it were not an exercise of discretion and did constitute a rule. The Court explained:

> It does not constitute the decision to exercise discretionary statutory authority under subsection j, rather it is an agency policy of general applicability implementing a law enforced or administered by the agency where the agency has chosen to implement a needs test. That is, while the agency's decision to employ a needs test represents the discretionary exercise of statutory authority exempt from the definition of a rule under subsection j, the test itself, which

is developed by the agency, is not exempt from the defini-
tion of a rule and, therefore, must be promulgated as a rule
in compliance with the Administrative Procedures Act. [*Id.*
at 5.]

That reasoning applies equally here. While the
department can choose not to contract with private
group home providers in order to fulfill its duties
under the Mental Health Code, once it chooses to do
so, the terms of the standard form contract that gov-
ern the provision of care to group home residents
that are developed and set by the department must be
promulgated as a rule.

Finally, the dissent's policy argument, *post* at 23,
that requiring the guidelines and standard form con-
tract to be promulgated as a rule would "subject[ ] lit-
erally thousands of present and future contracts with
the state to an unnecessarily burdensome process" is
unconvincing for two reasons. First, only those con-
tract provisions that serve to implement an agency's
statutory duties or mission can be deemed a rule
under the APA definition. Incidental contract provi-
sions, such as for the provision of laundry services at
a state mental institution, do not "implement[ ] or
appl[y] law enforced or administered by the agency"
or "prescribe[ ] the organization, procedure, or prac-
tice of the agency" and therefore do not come within
the definition of a rule.[9]

---

[9] In this regard, it is important to recognize that many provisions in the
standard contract involved here do not come within the definition of a
rule. I would hold that only those contract provisions that touch and con-
cern the care received by group home residents constitute rule making.
Consequently, only the proposed changes to those provisions must be
subjected to the APA's procedural requirements.

Second, and perhaps more fundamental, it is crucial that standard contracts that prescribe an agency's policies regarding the implementation or application of its statutory duties be subjected to the democratic process contemplated by the APA. Justice RILEY, in her partial concurrence and dissent in *Clonlara, Inc v State Bd of Ed*,[10] 442 Mich 230, 255-256; 501 NW2d 88 (1993), explained the important democratic function served by the APA:

> In Michigan, the exercise of legislative authority duly delegated to administrative agencies is referred to as rule making, and the APA prohibits rule making without undergoing strict public scrutiny through "public hearings, public participation, notice, approval by the joint committee on administrative rules, and preparation of statements, with intervals between each process." *Detroit Base Coalition for Human Rights of Handicapped v Dep't of Social Services*, 431 Mich 172, 178; 428 NW2d 335 (1988).
>
> The extensive notice and hearing procedures mandated by the APA " 'are calculated to invite public participation in the rule-making process, prevent precipitous action by the agency, prevent the adoption of rules that are illegal or that may be beyond the legislative intent, notify affected and interested persons of the existence of the rules, and make the rules readily accessible after adoption.' " *Id.* at 189-190, quoting Bienenfeld, Michigan Administrative Law (1st ed), § 4, p 4-1.
>
> More important, the APA is essential to the preservation of a democratic society. Put simply, without public oversight and scrutiny of legislative action undertaken by administrative agencies, such agencies would rule without the normal safeguards of our republic. Indeed, the APA is a bulwark of liberty by ensuring that the law is promulgated by persons accountable directly to the people.

---

[10] Incidentally, the dissent's reliance on *Clonlara* is puzzling. Crucial to the decision in that case, unlike here, was that the agency did not have rule-making authority. *Clonlara* is distinguishable on that basis.

The APA's function in this regard is especially crucial here, where an agency is relegating to private entities the performance of duties it was entrusted with by statute.[11]

### III

For all these reasons, we hold that those provisions of the Department of Mental Health's proposed revised guidelines and standard form contract prescribing departmental policies for the provision of care to group home residents constitute rule making under the APA. Consequently, the department was required to follow the procedural requirements designed to afford the interested parties notice and an opportunity to be heard before implementing them. We therefore vacate the Court of Appeals decision and remand for consideration of the appropriate remedy.[12] We further order that any contracts currently in force remain binding on the parties until the trial court reaches its ultimate disposition.

---

[11] Michigan's Administrative Procedures Act is unique in its extensive involvement of the Legislature in the rule-making process. Its requirements undoubtedly yield a more burdensome rule-making procedure than under the federal system. I am mindful that in adhering to its stringent requirements, some efficiency of government may be lost. This Court, however, must remain true to the statute's mandates. If the Legislature desires to shift the balance between efficiency and the democratic concerns addressed by the APA, it can do so. Concern for the efficient operation of our state agencies and departments, while valid, should not force this Court's hand.

Further, the result we reach does not prevent an agency from making changes to its standardized contracts, as long as those changes do not directly bear on the agency's statutory mandates and mission.

[12] Although AFSCME and the individual plaintiffs may have standing, we question what remedy may appropriately be afforded these parties. The parties have not addressed what remedy would be appropriate to protect the different interests of the individual and union plaintiffs.

LEVIN, CAVANAGH, and BOYLE, JJ., concurred with
MALLETT, J.

WEAVER, J. (*dissenting*). The majority holds that, to
the extent that they establish departmental policy and
standards for group home care, the guidelines and
standard contract utilized by the Department of
Mental Health when contracting with group home
providers constitute "rules" that must be promulgated
pursuant to the Administrative Procedures Act, MCL
24.201 *et seq.*;  MSA 3.560(101) *et seq.*  I write sepa-
rately to dissent because I would hold that the guide-
lines and the standard contract do not constitute
rules or rule making, and thus are exempt from the
formal adoption requirements of the APA. Because the
Department of Mental Health's decision to contract
with group home providers is a permissive exercise
of statutory power, and the guidelines do not directly
affect the rights of the general public, I would reverse
the appellate court's holding[1] that the guidelines and
standard contract revisions constitute rules under the
APA.

I

The Department of Mental Health's authority for
rule making is derived from the Michigan Constitu-
tion, which states that both the physical and mental[2]

---

[1] 206 Mich App 382; 522 NW2d 657 (1994). While the Court of Appeals
found the department's decision to contract with private providers to be a
permissive exercise of statutory authority, it nevertheless held that the
revisions of the guidelines and standard contract still constituted a "rule,"
according to the APA's definition, that requires promulgation pursuant to
APA procedures. *Id.* at 389 (opinion of JANSEN, J., joined by R. L.
ZIOLKOWSKI, J., concurring).

[2]    Institutions, programs and services for the care, treatment, edu-
    cation or rehabilitation of those inhabitants who are physically,

health of its citizenry are of paramount importance.[3] The Mental Health Code was adopted in furtherance of this constitutional mandate to provide legislation to protect and promote the public health of the people of Michigan. MCL 330.1116 *et seq.*;     MSA 14.800(116) *et seq.* This legislation grants authority to the Department of Mental Health to contract for services for mentally handicapped residents of the state. Pertinent powers and duties of the department include:

> (b) It may provide, on a residential or nonresidential basis, any type of patient or client service including but not limited to prevention, diagnosis, treatment, care, education, training, and rehabilitation.

> \*     \*     \*

> (d) It may operate directly or through contractual arrangement the facilities that are necessary or appropriate.

> \*     \*     \*

> (g) It shall endeavor to develop and establish arrangements and procedures for the effective coordination and integration of all public mental health services, and for effective cooperation between public and nonpublic services, for the purpose of providing a unified system of statewide mental health care.

> \*     \*     \*

---

mentally or otherwise seriously handicapped shall always be fostered and supported. [Const 1963, art 8, § 8.]

[3]   The public health and general welfare of the people of the state are hereby declared to be matters of primary public concern. The legislature shall pass suitable laws for the protection and promotion of the public health. [Const 1963, art 4, § 51.]

(j) It may enter into any agreement, contract, or arrangement with any public or nonpublic entity that is necessary or appropriate to fulfill those duties or exercise those powers that have by statute been given to the department.

*     *     *

(l) It shall have the powers necessary or appropriate to fulfill those duties and exercise those powers that have by statute been given to the department and which are not otherwise prohibited by law.

In conformity with its grant of statutory authority, the department utilizes a standard form contract (the DMH-3800B contract) for the purpose of obtaining services in provider homes for developmentally disabled persons. Once a provider agrees to enter into a contract with the department, the department guidelines also become applicable.[4] These guidelines have no legal force or effect, however, until a provider agrees to be bound by the terms of its individual contract with the department.

II

The majority maintains that the department must comply with the notice and comment provisions of the APA because the proposed guidelines and contract revisions constitute rules that must be promulgated pursuant to the specific procedures of the APA. I disagree. Section 7 of the APA defines a "rule" as follows:

"Rule" means an agency regulation, statement, standard, policy, ruling, or instruction of general applicability that

---

[4] The "Summary" portion of the guidelines evidence their limited application by providing: "This subject specifies the conditions governing the purchase of specialized residential mental health services from private or public providers when utilizing the DMH-3800B contract . . . ." Guideline III-C-001-0004.

implements or applies law enforced or administered by the agency, or that prescribes the organization, procedure, or practice of the agency, including the amendment, suspension, or rescission thereof . . . .

Relevant exceptions to the statutory definition of a "rule" include:

> (g) An intergovernmental, interagency, or intra-agency memorandum, directive, or communication that does not affect the rights of, or procedures and practices available to, the public.

> \*  \*  \*

> (j) A decision by an agency to exercise or not to exercise a permissive statutory power, although private rights or interests are affected. [MCL 24.207; MSA 3.560(107).]

The revised guidelines and standard form contract used by the department are excused from the APA's rule-making procedures by virtue of these two exclusions. The guidelines do not affect the rights of the general public, but only the rights of the parties who voluntarily enter into a contractual relation with the department. Furthermore, the standard contract itself is the means and manifestation of the department's exercise of permissive statutory authority. Because the department's decision to contract with private providers is a permissive exercise of statutory power, and the guidelines do not affect the public under MCL 24.207(j); MSA 3.560(107)(j), the standard contract and guidelines are not rules. Thus, I would hold that the revisions of the guidelines and standard contract do not constitute rule making, but fall under the list of statutory exceptions to the APA definition of a rule.

III

The APA defines the term "guideline" to mean:

> an agency statement or declaration of policy which the agency intends to follow, which does not have the force or effect of law, and which binds the agency but does not bind any other person.[5]

In *Clonlara, Inc v State Bd of Ed*, 442 Mich 230; 501 NW2d 88 (1993), this Court determined that compliance procedures are not rules and need not be promulgated in conformity with APA rule-making requirements even when the compliance procedures are communicated to the public.[6] As we stated in *Clonlara*:

> Communication to the public does not convert an interpretive statement into an independently enforceable rule. Rather, *informing the public is one of the purposes of inter-*pretive "rules." "Interpretive rules are statements as to what the agency thinks a statute or regulation means; they are statements issued to *advise* the public of the agency's construction of the law it administers."
>
> Further, the fact that persons may conform their behavior to the interpretations does not mean that the interpretations are legislative rules. The "pragmatic consequences" of interpretive "rules" is that they are published as "declara-

---

[5] MCL 24.203(6); MSA 3.560(103)(6).

[6] In *Clonlara*, a case ignored by all parties in the instant action, this Court overturned a Court of Appeals decision that held compliance procedures for home-schooling students were void because they violated the promulgation requirements of the APA. Though *Clonlara* involved an agency (the State Board of Education) without statutory power to promulgate rules, the dispositive issue was whether "interpretive statements might become rules with the force of law on the false premise that they were promulgated in accordance with the APA procedures." *Id.* at 243. The plaintiff-parents of home schoolers in *Clonlara* argued that because the compliance procedures, i.e., interpretive statements, were given to the public, the procedures were removed from exception § 7(g) of the APA.

tion[s] of the proper interpretation of the law, and those affected will normally conform . . . ." [*Id.* at 243-244 (citations omitted).][7]

Likewise, in the instant case, the act of supplying guidelines to those private mental health providers who choose to enter into a contractual arrangement with the department does not convert the guidelines into *legislative*[8] rules. Rather, the guidelines are *interpretive*[9] rules that inform providers of the standards the department expects and demands from its providers.

I would further find that the use of a standard form contract, and the revisions the department chose to make to that contract by virtue of the revised guidelines, is an exercise of permissive authority that is expressly excused from the APA's definition of rule. MCL 24.207(j); MSA 3.560(107)(j). Indeed, the Legislature has granted the department permissive statutory power to contract with any public or nonpublic entity to provide residential services for mentally disabled persons. As a public entity, the department could choose to provide these constitutionally and statutorily mandated services itself, or it could exercise its permissive authority to contract these services out. Similarly, none of the potential providers

---

[7] In *Clonlara, supra,* this Court also noted that persons who did not comply with the Department of Education's 180 days of school requirement risked enforcement proceedings for noncompliance by the department. In fact, the Department of Education initiated proceedings to enforce its interpretation of the statute. The instant case does not present this risk of enforcement. Both the Department of Mental Health and the potential providers have the right to choose or refuse a contractual arrangement.

[8] *Id.* at 239-241.

[9] *Id.*

are bound to provide services to the department, nor
are they prohibited from "hard bargaining" for terms
different from those offered in the standard con-
tract.[10] Contrary to the majority's assertions, modifica-
tions to the standard contract are authorized pursuant
to provisions within the guidelines.[11]

IV

This Court has, in the past, discussed the highway
department's use of standard specifications in high-
way construction contracts. *Greenfield Construction
Co v State Hwy Dep't*, 402 Mich 172; 261 NW2d 718
(1978).[12] Justice COLEMAN's concurrence expressed her
concerns with some of her brethren advocating an
abandonment of standard specifications for state
contracts:

[A]nalysis would force state agencies either to discard
standard specifications or move to adopt them as rules
under the APA. The former is inefficient, costly in both time
and money. The latter is cumbersome and would subject

---

[10] As the dissenting Court of Appeals judge states:

Standard contract language is binding on no one, neither the
DMH nor anyone else, until someone agrees to be bound by the
language. Even taking a position that no deviation from the lan-
guage will be permitted is simply hard bargaining: parties seeking
to contract with the DMH are free to counteroffer with any lan-
guage they wish. [206 Mich App 390.]

[11] The language of the guideline requires approval of the director of the
department for modifications or deletions. See Guideline, III-C-001-0004,
part (V)(B), p 3.

[12] Though the dispositive issue in *Greenfield* involved jurisdictional
questions between the Court of Claims and the circuit court, a component
of the argument and analysis concerned the highway department's use of
standard specifications in highway construction contracts. The Court in
*Greenfield* affirmed the appellate court with regard to the lack of juris-
diction in the circuit court, by a 3-2-1 decision, with five justices writing
separately and Justice MOODY not participating.

the policy and contract decisions of state agencies to fre-
quent circuit court review.

· This last point is of great concern to me. Our decision
cannot be limited to the highway department. It would
apply to all the many agencies of state government. It
would significantly increase the caseload of an already
overburdened circuit court. Delay, confusion, frustration
are predictable. [*Id.* at 199.]

In the instant case, the majority's finding, that the
guidelines and standard contract are rule making,
subjects literally thousands of present and future con-
tracts with the state to an unnecessarily burdensome
process.[13] As this Court recently recognized, agency
action statutorily exempted from the APA definition of
a "rule" represents the Legislature's best effort to bal-
ance the need for adequate procedural protections for
rule adoption with "the conflicting need for workable,
efficient, economical, and effective government on

___

[13] For example, the result of the majority's finding that the guidelines
and contract constitute "rules," is that the department must complete
each stage of the following process before making any changes to its stan-
dard DMH-3008B contract:

1. Publish the proposed rule in the Michigan register. MCL
24.208(1)(d); MSA 3.560(108)(1)(d).

2. Provide notice in the Michigan register and at least three
newspapers that a public hearing will be held to solicit views con-
cerning the proposed rule. MCL 24.241(1), 24.242(1), (3); MSA
3.560(141)(1), 3.560(142)(1), (3).

3. Conduct a public hearing. MCL 24.241(4), (5);    MSA
3.560(141)(4), (5).

4. Prepare a small business economic impact statement. MCL
24.207a(2), 24.240(1); MSA 3.560(107a)(2), 3.560(140)(1).

5. File copies of the rule with the Secretary of State. MCL
24.246(1); MSA 3.560(146)(1).

This process, as applied to revisions of the performance guidelines and
standard contract language, will be extremely cumbersome and defeat the
flexibility in negotiating contract terms with private mental health service
providers that the Legislature intended.

the other." *Detroit Base Coalition for the Human Rights of the Handicapped v Social Services Dep't*, 431 Mich 172, 184; 428 NW2d 335 (1988), citing Bonfield, State Administrative Rule Making, p 399.

v

Contrary to the majority's finding, the revised guidelines and standard form contract do not constitute "rules" within the definition of the APA. Defendant Department of Mental Health's choice of whom to contract with is a permissive exercise of its statutory power. Should plaintiffs seek such a contractual relationship, they are free within the parameters of bargaining to change or accept any of the terms of the proposed contract, and, upon acceptance and receipt of the contract, the terms of the guidelines. Because the guidelines and standard contract do not constitute "rules" and are exempt from the formal adoption requirements of the APA, I dissent and would reverse the decision of the Court of Appeals.

BRICKLEY, C.J., and RILEY, J., concurred with WEAVER, J.